Good morning may it please the court my name is Colin O'Brien and I am here on behalf of Alaska Wilderness League and the other petitioners. I would like to reserve seven minutes for rebuttal. Today's case concerns the showing that must be made by a sizable industrial source of air pollution like the cullic that plans to operate in multiple temporary locations within the Arctic where the air is pristine. In violation of the Clean Air Act, EPA granted Shell a permit without requiring Shell to demonstrate it would comply with so called increment standards intended to keep clean air clean. I intend to address two fundamental ideas this morning. First, in the same way that EPA and petitioners agree that section 504 E is an exceptional provision that imposes new substantive requirement on all temporary sources like the cullic to demonstrate compliance with national ambient air quality standards, so too does 504 E require the cullic to demonstrate compliance with any increments applicable to the areas that the cullic will affect. Second, I will explain how EPA's contrary view of 504 E tortures the word applicable beyond any congressional intent. EPA's interpretation hinges on the word applicable which the agency interprets to refer to requirements that are inapplicable to temporary sources and the word simply encompasses no such meaning. Ultimately then the only lawful interpretation is petitioners and on that basis the cullic permit must be vacated. So beginning with our view of the Act, section 504 E states that a title 5 permit may not be issued to a source that plans to operate in multiple temporary locations unless it will assure compliance with ambient standards and any applicable increment or visibility requirements under part C of subchapter 1 of the Act. Now reading this language simply, section 504 E requires all temporary sources seeking a title 5 permit to demonstrate that at each location it will comply with three comparable standards intended to protect air quality over a given area, namely the national ambient air quality standards and in those areas where they apply the increments and visibility requirements. As I noted... So your argument is essentially, as I understand it, location based as opposed to, I'll call it actor based or vehicle based if you will, is that it? Not exactly. I mean I think our interpretation accounts for both. Where 504 E prescribes the requirements for a permit, so to that extent we're talking about what will apply to an individual source. So the question then is looking at the text of section 504 E, when it uses the word applicable, is it talking about that what applies in a given area? So geography versus source of pollution. Right, and the reason why... Well if that's so, I mean the reason I want to stop you, I don't find any provision in part C that mandates that applicable is a function only of geography. In fact, I don't find anything in part C that says why geography and source can't be what we look at. What's the language that mandates this? Because what we're really looking at is whether I should give deference. Right. So cite me to the language that says this only deals with geography. Okay, I would point you to language in two places. First, if you look to 42 USC 7473, that part of part C establishes increments and explains that they vary on the basis of geography. They only apply in non-attainment areas and depending on the classification of the area, the stringency of those standards vary and they also only apply once they've been triggered. So that part of part C defines how increments work and says that they're based on geography. Nobody disputes that. The question then is what's the link between 504E, which is about Title V requirements and part C? And what Congress did is in Section 504E, it listed three standards that typically apply only to areas and said we're going to translate these for these particular temporary sources as requirements. So for that reason, Congress listed the three standards. National Ambient Air Quality Standards as well as increments and also visibility requirements. Now, one thing that your honor might find helpful is if you look to the Federal Register, 57 Federal Register at 32-276. This was EPA's initial Title V rulemaking when they interpreted the statute and they said very, very plainly, standards like the National Ambient Air Quality Standards are requirements on the states generally. They're imposed through SIFs generally and they're not typically requirements of individual sources. But the purpose of 504E that EPA highlighted there was to take these area-wide requirements and impose them on temporary sources in particular for a reason that EPA highlighted. Namely, states generally, when planning for the attainment with the various parallel air quality standards, do not account for temporary sources. So that was the very purpose of 504E and it's informed by the fact that applicable refers to increments which are distinguishable from National Ambient Air Quality Standards in that the National Ambient Air Quality Standards are universal, but the increments and visibility requirements are not. So when you look at the parallel listing of these standards and then when you look at the word applicable in that context, the only common sense meaning is that it's distinguishing on the basis of geography. I would note in comparison that although EPA says that their focus is on sources, in so focusing they ascribe to the word applicable an impermissible meaning. So according to section 504E's reference to applicable increment requirements means certain requirements defined under the PSD program that would apply to a temporary source if it was not actually temporary but a permanent source instead. And this interpretation wreaks havoc on any reasonable interpretation of the word applicable. But why couldn't the agency draw a distinction between a source that is temporary and by definition is not going to be there permanently in deciding what air quality standards a temporary source must meet that might be imposed if it were a permanent source? Because 504E doesn't give it any discretion. Section 504E refers to all temporary sources without qualification, not on the basis of size and not on the basis of state requirements. And although it was completely underplayed in EPA's brief with respect to National Ambient Air Quality Standards, there's no debate here. I thought the agency drew a distinction between PSD major source and PSD minor sources and the CULIC is, as I understand it, a minor source. Not for National Ambient Air Quality Standards. So under 504E, EPA's interpretation is regardless of your size. Well, if it's not for air quality standards, then what is the basis for the distinction? That's the only thing we're worried about, isn't it? It all rests on the definition of applicable. When 504E tells a temporary source that it must assure compliance with all requirements of the Act, including National Ambient Air Quality Standards and applicable increments, did Congress mean all temporary sources have to apply increments if they apply to the area? Or is it a reference to the PSD program? Let me see if I can come at this from a more practical standpoint. Sure. Is the real basis of your concern here that they need to do more than computer modeling before the permit should issue? Because I read through the permit and there are some pretty strict monitoring standards that are applicable to this drilling unit and its support fleet when it is actually engaged in exploratory oil drilling. So if it exceeds whatever the applicable air standards are, presumably EPA can shut it down immediately. Is that correct? Isn't that the purpose of the monitoring requirements? No, not exactly. Those monitoring requirements account for the emissions from the culloch in particular. But as we hopefully try to communicate in our brief, increments aren't only a function of the pollution of one ship. It's a cap that includes the pollution from all of the sources in a given area. And so increments are primarily done based on modeling and it's to ensure that all of the other sources are accounted for. Okay, so can you answer the other part of my question and that is what more do you want them to do than what they've already done? What we want them to do is demonstrate up front, as Section 504E requires, that they will not violate increments in any of the places that they will operate. And how would they do that? Wouldn't it be by computer modeling? It would be by a modeling exercise. What I would highlight here is... But haven't they already done modeling exercises? The only modeling that they did was to address compliance with the National Ambient Air Quality Standards. So 504E lists three standards. National Ambient Air Quality Standards, increments, and visibility requirements. But if we reject your argument that applicable includes increments for a PSD minor source, then they have already done, in the agency's view, what is necessary to do in modeling. Is that right? Correct. Although the way that the agency reaches their outcome is important. This isn't ultimately about the specifics of what we're asking, apart from the fact that we're asking what the statute requires. 504E says that up front, you have to demonstrate compliance with each of three standards to the extent that the second and third, increments and visibility requirements, apply up front before you get the permit. Right? So 504... Okay. But if worst case scenario, your computer model is wrong, and we go out and we start drilling for oil, and we produce a lot of pollution, the whole purpose for the monitoring is if it exceeds certain levels, we shut it down. Right? Yes and no. Yes, there are monitoring provisions, and those pertain to the pollution that's coming out of the stacks on Shell's ship. That's very different than asking whether within the area writ large, whether the collective contribution of all of the sources is resulting in ambient levels that comply with the statute. And that's the purpose of 504E. So how big an area do you maintain the air regulators need to be testing? EPA has, I should say, what I'm asking for here, is not remarkable. It is, for the largest sources, this type of modeling is done. It's a precondition of issuing the permit, and EPA has protocols... Okay, but I'm asking you a temporal question. How far away from the Kulik are you saying air quality has to be measured? I'm not an expert on EPA's modeling conventions, but typically the radius is about 50 kilometers. And so the question is, what is the impact within those 50 kilometers of the Kulik, along with any other sources that may be located, for example, out on the outer continental shelf or 8 miles away on the shoreline? But one thing I want to focus on here is EPA's impermissible definition of applicable. So EPA says that the requirements that we adjudge to be applicable for temporary sources are those that would apply if it weren't actually a temporary source, but a permanent source instead. The reason they do this is Section 504A works in companionship with 504E. And 504A says everything that a source is already required to do, you got to do for your Title V permit. So something additional has to come out of 504E. So EPA says, well, let's look at what a permanent source would do, and we'll make the temporary source do the same thing. But the reason that doesn't work is that the temporary sources are exempt from the very requirements that EPA would apply. So they're saying applicable means requirements that are actually inapplicable. And this is not only true of the big sources, but of the small sources. When we're talking about small sources, EPA says we'll only impose an increment requirement in the following hypothetical situation. A state decided, even though it doesn't have to regulate small sources, and we've never seen an example of where small sources are regulated to prove increments, but we'll deal with a state that decides that it will institute an increment requirement for small sources that are permanent, but not the small sources that are temporary. And in that instance, we'll swoop in and override the state judgment and create parity between permanent and temporary. The problem with this, though, is that the word permanent doesn't appear anywhere in Section 504E. Additionally, it's odd that EPA would say it wants to delegate this responsibility to states, but then override the state's judgment in a particular instance. Also, the purpose of 504E broadly is to require temporary sources to comply with these area-wide requirements, and there's no mention in 504E about a distinction based on size or variable state requirements. Just, I think, before you quit, you need to tell me, in a succinct style, why Reed Oil doesn't just foreclose your arguments here. Red Oil says that an agency's interpretation, like an EAB decision, might merit deference, to the extent any other action might receive deference. But under Chevron, even when an agency's decision is eligible for deference, you have to show first that the statutory language is ambiguous, and we believe here that it's not. Well, I heard your argument that it's not. But I'm supposing, if I suppose that it is, then I think you've lost altogether. But let's go on with what you're saying on Reed Oil. Right. But even if an agency decision might merit deference, the key question is whether the agency's interpretation is permissible, whether within that ambiguity the agency is still offering something that comports with the statutory language. So for example, the Supreme Court, in its MCI v. AT&T decision, said, you know what, the word modify is ambiguous, but it can't mean what the agency said it meant in that particular case. Likewise, I'd point your honor to the D.C. Circuit's decision in Nuclear Energy Institute v. EPA, which I think is directly on point. In that instance, the D.C. Circuit's interpretation is operating in a bizarro world. And the court concluded that only in a world where based upon means in disregard of, and consistent with means inconsistent with, could EPA's interpretation be considered permissible. Here what EPA has done is they've taken the word applicable to mean requirements that are not applicable. They are inapplicable to temporary sources. But I guess applying Chevron deference to that, why is that not a reasonable interpretation of the word applicable? It seems to me to be a pretty common sense distinction between major sources and minor sources. Their distinction isn't based on major versus minor. That's not the entire crux of their position. But this is a rig that only operates 120 days a year, as opposed to a permanent facility that presumably operates 365 and maybe 24-7. No, the definition of temporary is a source that will operate in one location for less than two years. So the definition of temporary is much bigger. But here the permit is much more restrictive than that, is it not? The permit is for approximately five months. Well, and a maximum total number of hours. Right. But the question isn't just is EPA doing something here. The question is are they doing what is commanded by the statute? I guess the question is, is it an illogical, arbitrary, capricious delineation of when full compliance is required versus less than full compliance? Well, no. I think that the question is what does the statutory language say about the choices that, or about the requirements that a Title V source... What standards should be applied to what, is it not? And that is informed by the statutory language. The statute doesn't say anything about permanent sources. And that's the problem here. EPA's interpretation... We don't know applicable to what. That's what we're wrestling with, are we not? Yes. Although I think as I've explained, when you look at the three items mentioned in the list, like national ambient air quality standards, as well as increments, they should be interpreted similarly. And in this case... But that still doesn't tell me to what it is directed. Well, but applicable in that case differentiates between the NAAQS, which are applied universally, and which EPA agrees applies to all Title V sources, regardless of size, regardless of state requirements. And on the other hand, increments, which vary by geography. Okay. I'll give you a little more time than 35 seconds on rebuttal, Mr. O'Brien. Okay. Ms. Purdy or Dean Sullivan, who's next up? Ms. Purdy. All right. Good morning, Your Honor. Again, Angeline Purdy for EPA. With me is Alexander Fittis of EPA's Office of Regional Counsel. I am going to watch my time and endeavor to reserve eight minutes to yield to the interveners. I'd like to begin with the question of whether there is language in the statute that clearly indicates that Congress intended EPA to adopt the approach that petitioners are arguing for. I think petitioners were unable to identify such language. The statute is ambiguous on this point. I think that there are arguments as to why the three standards that are being talked about here, NAAQS, applicable increments, and applicable visibility requirements, which are not an issue here. Their arguments as to why those should supposedly be treated in a similar fashion actually highlight the fundamental flaw in their approach, which is that they are not only not locating language in the statute that dictates the result that they would like, they're writing some of the language out, and they're ignoring the fact that these are fundamentally different kinds of standards. A NAAQS is an air quality standard, a health-based or public welfare-based standard that EPA has set that says this is an absolute number. Anything above this number, this is the number that you must attain to maintain public health or public welfare with an adequate margin of safety. Increments are different. Increments are an air quality management tool. They are not a permitting requirement. They are a tool that states use once they have attained the NAAQS, once they have air quality established, to then manage growth economic development within those increments. They're fundamentally different kinds of standards, and there's no reason that EPA should have to approach them the same way in deciding what's applicable. And again, the statute refers to applicable increment requirements. So how does an increment become a requirement? Through a permitting scheme, either because a source is a major PSD source and is required to obtain a PSD pre-construction permit, or because a state has chosen through its minor source program to require a demonstration that emissions from that source will not cause an exceedance of the increment. That's how an increment, which applies to a geographical area, becomes a requirement. And petitioner's argument essentially writes requirement out of the statute. Regarding EPA's actual interpretation here, I'd like to see if I can get us out of bizarro world and outline EPA's actual approach. There's been a lot of focus on temporary versus permanent sources. EPA approaches this by saying, okay, 504E, first of all, yes, it does add something. So what does it add? With regard to the NAAQS, the reason that those aren't discussed much in the briefs is there's just really not much of an issue there. EPA agrees. Even a minor source that would not otherwise be required to demonstrate that it won't cause an exceedance of the NAAQS is required to make that demonstration  Not an issue. Applicable increment requirements. EPA, again, looks to, is there some requirement that that source, if it were locating as a permanent source, would be required to comply with? That requirement can come either through, again, it being a PSD major source, it would be required to make that demonstration, or through it being a minor source that would be required to make that demonstration under the state's permitting program. Neither of those conditions obtains here, and so the CULIC was not required to make that demonstration. The notion that this is somehow overriding what a state has chosen, I think, assumes that the state would somehow have said in its SIP, and Alaska has not, that certain requirements were going to apply these increment requirements to permanent sources but never to temporary sources. You notice that the state itself has made some sort of choice to differentiate between permanent and temporary sources, and that's simply not the case. Alaska hasn't required any source to demonstrate as part of minor source permitting that it will not cause an exceedance of the increments, and so consistent with the language of 504E, which refers to applicable increment requirements, EPA did not require the CULIC to make that demonstration to obtain a temporary source permanent. Had the state said, yes, minor sources must make this demonstration, then the CULIC would have been required to make that demonstration at any location at which it would operate. So the other puzzling thing, I think, about this argument is So as I understand it, your position is the EPA has really not changed anything that the state has required. Correct, Your Honor. That's what I understood, okay. Yes, correct, Your Honor. I think the other puzzling thing to me is that all parties agree that 504E adds something, and yet petitioner's objection appears to be that by interpreting 504E such that potentially certain sources would be required to make a demonstration they otherwise wouldn't be required to make, we're misinterpreting the statute. We are, in fact, interpreting it to add substantive requirements in certain circumstances. The regulation that would exempt portable sources under certain circumstances from demonstrating that they won't cause an increment violation, that's a regulation under the PSD program. But EPA's view is that if a source that would otherwise be able to take advantage of that exemption is applying for a permit under 504E for operations as a temporary source, then they can't use that exemption. They have to make the demonstration that is required by 504E at each location at which they'll operate. So it's simply a straightforward relationship of the regulation to the statutory language that Congress used, which obviously would control over any regulatory exemption that might otherwise exist. I think I would agree that I think red oil resolves the issue that the court in this instance should defer to EPA's interpretation because the statute is ambiguous. Again, petitioners have not pointed to any language that makes it unambiguous. So the question then is not is EPA's interpretation the best one or could even, excuse me, could EPA have adopted some alternative approach, but is it a reasonable approach? And EPA's approach is entirely reasonable in that it harmonizes what is required of a temporary source operating at a particular location with what a state, again, would require of that source operating at that location. And it seems to me that when you say red oil, he said red oil. I say reed oil. I'm from Idaho, so I'm way out of it. But it seems to me that reed oil, in my words, forecloses their argument as to ambient air. Yes, Your Honor. Because it directly addresses ambient air. And then it seems to me that it also somewhat forecloses their argument, if it doesn't foreclose their argument, about whether I should give deference to the interpretation here. I agree, Your Honor. I think it does foreclose their argument on deference because their only argument on deference is, well, the statute is unambiguous, and if it isn't, EPA's interpretation is unreasonable. And that's simply how deference works. I will defer to petitioners' pronunciation of reed oil. It resolves the issue of whether the EAB decision is the kind of authoritative statement as to which a court would normally defer. And because the statute is, in fact, ambiguous and because EPA's interpretation is reasonable, the court should defer to that interpretation in this instance. Well, there are times when the EPA, what the EPA does, I do not agree with, and I fight to the end. However, we've got to have some standard by which our court operates, and one end of us will go after it in one way and one end of us will go after it in another, but we've got to have something where we call a truce. And that's why I wondered where you were going with reed oil. And I would agree, Your Honor, that that's where that line is drawn and that reed oil has resolved that in terms of deferring to a reasonable interpretation articulated by the EAB. I think that I have covered what I need to cover, so if the court has no questions, I will yield my remaining time to the interveners. Very well. Thank you, Ms. Burdy. Good morning, Your Honors, and may it please the court. Kathleen Sullivan for the intervener, Shell Offshore. Judge Smith, you're absolutely right that reed oil resolves the question of the standard here, and that is that this court must give deference to the meticulous and well-reasoned decision of the EAB because after reed oil, EAB decisions interpreting the statutes that EPA is applying are entitled to Chevron deference, and here the provision is ambiguous and EPA's Region 10's interpretation as affirmed by the EAB is reasonable, and that's going to be the end of the matter. But what I'd like to spend some time on, Your Honor, are the specific statutory provisions that were being interpreted because I think that will help show why, and we agree with everything my colleague from the Department of Justice said about this, but I think if we look at the statute, we're going to see why EAB was so reasonable here and why its decision deserves deference. I'd like to begin with 504E itself because my colleague from the petitioners never really quoted it for what it really says, and I think it's important to do that. This is easily accessible at page A47 in the blue brief. Temporary sources are required to get a permit, an operating permit under Title V, to demonstrate compliance with all the requirements of this chapter at all authorized locations, including but not limited to ambient standards and compliance with any applicable increment or visibility requirements. Now, that language, starting with the text and why this is reasonable, distinguishes between ambient standards, the so-called MACs. Everybody has to comply with those. There's no limitation to those being applicable. But then the word any applicable applies to increment requirements. Now, what are those increment requirements? Those are those new prevention of significant deterioration requirements that come in in 1977, and they say everybody has to comply with MACs, but in certain areas you've got to comply with MACs and PSD increment requirements. But who has to comply? So the answer to the question at the beginning, as both Judge Tolman and Judge Smith said, are increments an area requirement only, a location requirement only, a geography requirement only, or are increment requirements both geography and source, location and actor? And the answer is absolutely the latter. Increment requirements, unlike MACs requirements, are interpreted in the statute by reference both to areas. Are we in an attainment area? Yes, a Class I, Class II, Class III, or a non-attainment area, or an unclassifiable area. But second, compliance with increments is written in the statute and the regs to be source-specific. So it's area and source, and that's what EAB interpreted. Now, how do we know that? We know that that, and I'd like to refer you next, Your Honors, if I could, to another piece of the statute that petitioners studiously avoided, and that's 42 U.S.C. 7475. That's in the Blue Brief Appendix of A26. Now, that's the one that tells us that major emitting facilities, major emitting facilities, have to demonstrate for pre-construction permits that they will comply with increment. That's 7475, Sub A, Sub 3, Sub Big A. Now, this is where it comes to Judge Tolman's point. First, we've distinguished NACs from increments. NACs are area-specific. PSD increments are area plus source. Now, where is the source distinction? I just gave it to you. It's in 7475. Major, minor. Judge Tolman says, isn't the key distinction here once we get past NACs and increment? The key distinction for who has to comply with increment is major sources versus minor sources. It's undisputed that CULIC is a minor source. That is, it does not have the potential to emit more than 250 tons a year. It's undisputed. Now, we know from the entire structure of the PSD increment rules that it's major sources that have to comply, if they're permanent, with the PSD increment demonstrations. Minor sources do not have to. Now, along comes Congress in 1990, and it provides these new rules for temporary sources. What are we going to do with temporary sources? And 504E comes out of that. And remarkably, petitioners give new meaning to the tail wagging the dog. They want to take this new application to temporary sources, the ones that, as Judge Tolman observed, are going to cause less degradation to the environment as an initial premise, and give them a requirement that's greater than permanent sources would have. But that's not right. What 504E does is not change the background structure. It enacts increments, and within increments, major-minor. All that 504E does is tell you, if you're a temporary source, how are you going to get your operating permit? And the answer is, you're going to have to show compliance with ambient standards. You've got to do that if you're a major or a minor. And as Judge Tolman correctly observed before, CULIC shall amply demonstrate that they would comply with FINAX requirements. Their permit enforces that. But CULIC was not required to show that it would comply with increment restrictions because it's not a major source. And if it's not a major source, it doesn't matter whether it's permanent or temporary. If it's not major, it does not have to demonstrate in a predictive modeling sense up front that it's going to comply with increments. Now, so just to recap. And am I correct that because of all of these restrictions in the permit and all of the monitoring that's going to go on when the unit is operating, if they exceed the standards that the permit sets, you shut the unit down? Well, Ryan, we don't concede you necessarily shut the unit down. But we do concede there's a lot of process involved. Well, you have to file a report. That's pretty clear. There'll be a lot of papers. But Judge Tolman, you're absolutely correct that the permit imposes very stringent limitations on the CULIC. If you look at ER 41, ER 44 to 51, you're going to see a whole set of very specific emissions controls that CULIC has to comply with. And, yes, those are subject. Those controls, Judge Tolman, are subject to enforcement, no question about it. But I think what Petitioner's going to get up and say, as he did before, is, well, I'm not just worried about those emissions controls. We are worried about the effect the CULIC is going to have on the broader atmosphere and the entire area. And that's going to cause a problem for PSD increments. Remember, PSD increment is an aggregate concept. In our area, are we going to have NOx, SOx, or particulate matter coming out in aggregate quantities that deteriorate the air past a certain delta from a baseline? Baseline is set when you have your first major source get permitted. Baseline set can't exceed the delta. All sources together can't exceed the delta. But, Judge Tolman, there's an answer to that, too. We are bound, Shell's CULIC is bound, under our permit, to comply with all of those very specific emissions controls that are in the permit. But second, and in addition, and this is why there's no loophole here, and there's no practical problem here, if CULIC contributes NOx, SOx, and particulate matter in such quantities that, oh dear, the aggregate PSD increment has been exceeded, we've got too much in the whole area, there is a remedy, and it's at ER 217, and I respectfully refer you to look at that when you can, Your Honors, because at the top of ER 217, this is Region 10's response to comments, at the top of 217 it says, well, if there's exceedance of the entire increment in the area, then the response lies with the state implementation plan, that very first paragraph at the top of the page. Let's suppose NOx, SOx, and particulate matter get too big for our PSD increments in this area as a whole. Well, then it's up to Alaska, and I would respectfully refer, Your Honors, to the amicus brief from the state of Alaska, which supports the arguments by EPA and supports the arguments by Shell here that this is reasonable. Then it would be up to the state of Alaska to change the state implementation plan, because we have here, Your Honor, a system of cooperative federalism in which state responsibility, far from being hypothetical, as the petitioners allege, state responsibility is at the heart of the entire statutory structure. So I have to refer, Your Honors, to one more piece of the treasure map here. It's provision 42 U.S.C. 7407. That's in the appendix to the blue brief at A3. And if you look at that, you'll see that it's the responsibility for each state, sorry, the responsibility of each state to maintain air quality through the submission of implementation plans, the so-called SIPs. So, Judge Tolman, if CULIC emits too much pollution in violation of its operating permit, there's enforcement as to the permit. But second, the state implementation plan is available. If CULIC emits so much matter, the defined matters that pertain to PSD increment, that the whole area exceeds the PSD increment, then there's a remedy too, and it's the state implementation plan. Now, petitioner ignores all that. And yet everything I've described is the only thing that gives meaning to the terms any applicable. And you have to read 504E as any applicable increment requirement. And, Judge Smith, you're exactly right. That didn't change the background law. It's the background law that tells us what's applicable. And the background law says increment pre-compliance is required only for major sources, and it would be exceedingly odd if Congress was going to say, well, the precondition of increment compliance has to be demonstrated by temporary sources under 504E when it doesn't have to be demonstrated by permanent sources under the background law. So not only is petitioner's argument no more rational than EPA's, and you should defer to EPA's as long as it's reasonable,  Petitioner's interpretation is unreasonable. So, Your Honors, there's no practical problem here. There's no loophole here. There's no surplusage in 504E. 504E added something important to the statute. It said temporary sources can come get their operating permit through so-called one-stop shopping. We're going to come once, and we're going to get the permit for all our locations. But nothing in that one-stop shopping changed the distinction between increment and national ambient air quality standards, and nothing in that new one-stop shopping provision changed the difference between major and minor sources. CULIC is a minor source. EAB's decision should be deferred to because it reasonably held that a minor source, like the CULIC, need not demonstrate prior to an operating permit that it will comply with increments, and there's ample other opportunity through the state implementation plan to regulate any exceedance of increments should CULIC ever contribute to it or consume too much of it. So, with respect, Your Honor, if there are no further questions, we agree with EPA. Shell agrees with EPA that you should deny the petition and give deference to the reasoned decision of the EAB. Don't sit down. You had asked us to defer the argument for six months while your client decided whether or not it was going to make the repairs in the Singapore shipyard. Do we have an answer yet as to whether or not it's feasible to repair the damaged hull? Well, Your Honor, we're still actively working on the repairs, but we have, as you know, and as we said in our letter, deferred to at least the 2014 drilling season, any further use of the CULIC for exploration. In fact, we've deferred the 2013 drilling season to 2013. So it's not going to operate in 2013? That's correct. But this air permit, Your Honor, with respect, although we asked for a continuity, we felt it was our duty to inform the court of some uncertainty here, we would respectfully suggest that the case is not moved, that you should decide and deny the petition. Well, your permit's good until what, March of 2016? That's correct, Your Honor. So under current conditions, what really introduces the uncertainty is not the state of the repairs. It's the change of law in the appropriations. So I guess the only thing we need from you, Ms. Sullivan, is a promise that if Shell ultimately decides that it's not going to use the CULIC under the permit, I think that would move the case. And if that decision gets made, would you please notify us? Your Honor, we'll notify you of that, two things. One, any update on the state of the CULIC. But two, remember we're in negotiations, as we mentioned in our letter, about whether we can shift to DOI air permitting under the new statutory regime, as opposed to having to maintain the permit we have now. But we have the permit now. We think we correctly have the permit now. There's nothing unlawful in it. And unless and until, in our talks with the agencies, we were to get a shift now from EPA to DOI, then we would respectfully suggest that the case is not moved, and we would request denial of the petition. We will absolutely, Your Honor, apprise the court of any update on the discussions with the agencies or the state of the CULIC. Thank you, Your Honor. Thank you very much. Mr. O'Brien. If Your Honors will allow me, I have four quick points that I think get. We've got plenty of time. Okay. Go ahead. I think there are four quick details that make all the difference in the world in this case, and they're details that the respondents have not offered. So first, let's begin with this story that Counselor Sullivan tells about how increments are only ever implemented when a major source is asked to do so under PSD. That is accurate as far as the PSD program goes, but that does not distinguish the National Ambient Air Quality Standards from increments. If you look at 42 U.S.C. 7475, the only time that a typical source has to comply or show up front that it's going to meet the National Ambient Air Quality Standards is through the PSD program in the same way that increments are applied. So to the extent that the respondents would have you believe that there's something distinct about increments that work differently from NACs, that's not accurate. And the reason that that similarity of how the two standards operate under PSD is important here is EPA is doing something new and different and unprecedented for NACs. If you look to the excerpts of record at 138, 139, that's the EAB decision. The EAB says, nobody here contests that 504E is creating a new requirement unique to temporary sources to demonstrate compliance with NACs at all locations regardless of size and regardless of the state permitting requirements. So what petitioners are asking for here is that in the same way EPA has created something new and different for NACs, that the same thing be created new and different for temporary sources and increments. Now, Counselor Sullivan says, wow, that's asking a lot of a temporary source. Why on earth would Congress require something more for temporary sources than they would for permanent sources? EPA answered this question directly. The same question that Counselor Sullivan posed was posed in the rulemaking for Title V in 1992 where commenters said, really, you're going to require more for permanent sources than temporary? And what EPA said, and I will direct you to 57 Federal Register 32276, what EPA said is, in the ordinary course of things, states and our major source permitting programs don't account for temporary sources. And because these sources move around and states haven't planned on it, that threatens air quality. So EPA has supplied the answer. Congress has supplied the answer in 504E. And that is that temporary sources have to do more because they're not accounted for otherwise. So my second point deals with an issue that was raised by Counselor Purdy. She said, look, judges, let's not make this more complicated than it is. We're not asking states to do anything more than they would have to do otherwise. That answer should trouble you for two reasons. First, look at Section 504A. Section 504A, as well as EPA's implementing regulations, say anything that a source is otherwise required to do under the states automatically goes into their permit as a consequence of 504A. So anything states are already doing is covered by 504A. The question is, what does 504E add? And we think it means that they have to show compliance, all temporary sources in all instances with both NAAQS and the increments. But I'll note what's troubling about EPA's answer is, on the one hand, they say we're actually not requiring anything new, which doesn't work because of 504A. But then if you look at the record, excerpts of record at page 202, this is, I believe, EPA's brief before the EAB or the response to comments. But there, what EPA says is, look, if a state has a requirement for a permanent source but not a temporary source, we're going to take that permanent source requirement and foist it upon the temporary source, even though the state, in its discretion in the first instance, did not decide to do so. So ultimately, I think you see that EPA is caught between trying to say that they're adding something new but not trying to add anything big. And the problem is that that leads you down a rabbit hole and violates the language. All right. You've got a minute to get your third and fourth points. The third point I would make is that even when the court is operating under Chevron Step 2 and assessing whether or not to provide deference, an agency's interpretation can still be found impermissible. That's what happened in MCI. That's what happened in the Nuclear Energy Institute case. That's what happened in NRDC versus NIMS. We know that. Right. And then the fourth point is that there is no reassurance in the fact that EPA may come back and later fix violations. If you look at the second sentence of 504E, it says that a permit shall not be issued unless it assures compliance with all requirements of the Act. What Congress demanded was not that EPA fix things in the end, and maybe not at all depending on whether they get to it, but that they resolve these issues of potential air quality violations up front prior to issuing a permit. Okay.  Very well argued, Mr. O'Brien. Thank you all for a very helpful and interesting case. The case, as argued, is submitted for decision, and we'll get you a decision as soon as we can figure out what the answers are. Thank you. We are adjourned until tomorrow morning. All rise. All persons having had business with the Honorable United States Court of Appeals for the Ninth Circuit will now depart. This court for this session now stands adjourned.
judges: Tashima, Tallman, Smith